UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 FEB 18 P 3: 17

U. DISTRICT COURT
DISTRICT OF MASS.

COMMONWEALTH CARE
ALLIANCE, HEALTH CARE FOR
ALL, GLENN CRENSHAW, AND
PAULA CRENSHAW, individually
and on behalf of persons similarly
situated,

Plaintiffs

v.

ASTRAZENECA
PHARMACEUTICALS L.P.,
ASTRAZENECA PLC,
ASTRAZENECA US, ZENECA, INC.,
AND ZENECA HOLDINGS, INC.,

Defendants.

05   10335 DPW

Civil Action No. 05-0269

MAGISTRATE JUDGE RBC

RECEIPT #_____
AMOUNT $ 250
SUMMONS ISSUED N/A
LOCAL RULE 4.1____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY CLK_____ TOM
DATE 2/16/05

## **DEFENDANTS' NOTICE OF REMOVAL**

Defendants AstraZeneca Pharmaceuticals LP, AstraZeneca PLC, Zeneca, Inc., and

Zeneca Holdings, Inc. ("Defendants") (AstraZeneca US is not a legal entity) file this Notice of

Removal and hereby remove the above-captioned action from Superior Court of the State of

Massachusetts, County of Suffolk, to the United States District Court for the District of

Massachusetts pursuant to 28 U.S.C. §§ 1332, 1367, 1441, 1446 and Federal Rule of Civil

Procedure 81(c). As grounds for removal, Defendants state as follows:

1.      On January 25, 2005, Plaintiffs Commonwealth Care Alliance ("CCA"), Health

Care For All, Glenn Crenshaw and Paula Crenshaw commenced this action purportedly on

behalf of themselves and all others similarly situated by filing a Class Action Complaint And

Jury Trial Demand (the "Complaint") in the Superior Court of the Commonwealth of Massachusetts (Suffolk).

2.      Plaintiffs served a copy of the Complaint upon AstraZeneca Pharmaceuticals L.P. [*sic*] and Zeneca, Inc. on February 1, 2005, by causing a copy of the Summons and Complaint to be delivered to CT Corporation System, the designated agent for service of process for AstraZeneca Pharmaceuticals LP and Zeneca, Inc.

3.      All process that has been served in the action is attached hereto.

4.      The above action is one of which this Court has original jurisdiction under 28 U.S.C. § 1332 and supplemental jurisdiction under 28 U.S.C. § 1367. The action may be removed to this Court by Defendants pursuant to the provisions of 28 U.S.C.§ 1441, in that it is a civil action in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is one between citizens of different states.

5.      Upon information and belief, and as alleged by the Complaint, each of the named Plaintiffs is a Massachusetts citizen. No defendant is a Massachusetts citizen. Accordingly, there is complete diversity of citizenship in this action.

6.      In section V of the Complaint, Plaintiffs purportedly state claims for alleged unfair and deceptive practices, false advertising and deceptive pricing. In their prayer for relief, Plaintiffs seek monetary damages calculated as the actual damages determined at trial or $25 per sale of Nexium® in Massachusetts, whichever is greater. Plaintiffs also seek treble damages, restitution and/or disgorgement of all unlawful or illegal profits received by Defendants, injunctive relief and attorneys' fees. Upon information and belief, the value of this requested relief exceeds $75,000. Defendants deny liability to Plaintiffs in any amount.

7.    In particular, Plaintiff CCA is alleged to be a third party payor that buys medications, including Nexium[®], on behalf of its consumer beneficiaries.  Plaintiff CCA joins in the three causes of action brought by all of the Plaintiffs and requests the same relief, including actual damages, treble damages, disgorgement, injunctive relief and attorneys' fees.  Upon information and belief, the value of this requested relief exceeds $75,000.

8.    This Court has original jurisdiction over the claims of Plaintiff CCA pursuant to 28 U.S.C. § 1332.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the claims of the remaining named Plaintiffs and unnamed class members whose claims may not meet the amount-in-controversy requirement.  *Cf. Ortega v. Star-Kist Foods, Inc.*, 370 F.3d 124, 132 n.7, 143 n.19 (1st Cir. 2004), *cert. granted*, 125 S.Ct. 314 (U.S. Oct. 12, 2004), (oral argument set for March 1, 2005).

9.    In a separate pleading filed herewith, Defendant AstraZeneca PLC has provided notice of its consent to removal of this action without waiving any grounds that it may have to challenge service of process or contest this Court's jurisdiction over AstraZeneca PLC.

10.    Defendants will promptly provide Plaintiffs' counsel with a copy of this Notice and will promptly provide notice of same to the Clerk of the Superior Court of Massachusetts, Suffolk County.

11.    This Notice is filed within 30 days after receipt by Defendants of a copy of the Complaint and is timely pursuant to 28 U.S.C. § 1446(b).

WHEREFORE, Defendants say that this Court has jurisdiction pursuant to 28 U.S.C. §

1332 and 28 U.S.C. § 1367, and that the action is properly removable to the United States

District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1441.

Respectfully submitted,

ASTRAZENECA
PHARMACEUTICALS LP

ASTRAZENECA PLC

ZENECA, INC.

ZENECA HOLDINGS, INC.

By their attorneys,

Harvey J. Wolkoff (BBO #532880)
Joshua S. Levy (BBO #563017)
Peter L. Welsh (BBO #643261)
ROPES & GRAY
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

Dated: February 18, 2005

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on February 18, 2005 I caused a true copy of the above document to be served by mail upon counsel for Plaintiffs at the following addresses:

Thomas M. Sobol
One Main Street, 4th Floor
Cambridge, MA 02142

and

Steve W. Berman
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101.

Joshua S. Levy

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Commonwealth Care Alliance, et al. | AstraZeneca Pharmaceuticals, LP, et al. |

| (b) County of Residence of First Listed Plaintiff **Suffolk** | County of Residence of First Listed Defendant |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

| (c) Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Hagens Berman, LLP, One Main Street, 4th Fl., Cambridge, MA, 02142 | Ropes & Gray, LLP, One International Place, Boston, MA 02110-2624 |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

*PERSONAL INJURY*
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

*PERSONAL INJURY*
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
  Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☒ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding

☒ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. s. 1332

Brief description of cause:
Consumer Protection

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE: 02/18/2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) _Commonwealth Care Alliance, et al_

   _vs. Astrazeneca Pharmaceuticals LP, et al_

   FILED
   IN CLERKS OFFICE

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL

   COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).    2005 FEB 18  P 3: 27

   ___  I.      160, 410, 470, R.23., REGARDLESS OF NATURE OF SUIT.    U.S. DISTRICT COURT
                                                                       DISTRICT OF MASS.

   (II.)  195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
          740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.      for patent, trademark or copyright cases

   ___  III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
               315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
               380, 385, 450, 891.

   ___  IV.     220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
               690, 810, 861-865, 870, 871, 875, 900.

   ___  V.      150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE
   HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

   _NONE_

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
   COURT?
                                                   YES        (NO)

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
   PUBLIC INTEREST?   (SEE 28 USC §2403)
                                                   YES        (NO)

   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                   YES         NO

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
   28 USC §2284?
                                                   YES        (NO)

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
   COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
   SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
                                                   YES        (NO)

   A.    IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

         EASTERN DIVISION          CENTRAL DIVISION          WESTERN DIVISION

   B.    IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
         GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

         (EASTERN DIVISION)        CENTRAL DIVISION          WESTERN DIVISION

   (PLEASE TYPE OR PRINT) _Joshua Levy_
   ATTORNEY'S NAME _____
   ADDRESS _Ropes & Gray LLP - 1 International Place, Boston_
   TELEPHONE NO. _1 617-951-7284_

   (Cover sheet local.wpd - 11/27/00)

CT System

**Service of Proc    Transmittal Form**

Boston, Massachusetts

02/01/2005

Via Federal Express (Overnight)

**TO:** AstraZeneca Pharmaceuticals LP
Legal Department (FOP3)
1800 Concord Pike
Wilmington, DE 19850

**RE:** **PROCESS SERVED IN MASSACHUSETTS**

**FOR**    Zeneca, Inc. Domestic State: De

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

| | |
|---|---|
| **1. TITLE OF ACTION:** | Commonwealth Care Alliance, et al., Pltf. vs Zeneca Inc., et al. including AstraZeneca Pharmaceuticals L.P., et al., Deft. |
| **2. DOCUMENT(S) SERVED:** | Summons, Complaint |
| **3. COURT:** | Commonwealth of Massachusetts, Suffolk Superior Court<br>Case Number 05-0269 |
| **4. NATURE OF ACTION:** | Deception and other misconduct resulting in personal injury/unlawful and wrongful conduct/Unfair and deceptive business acts and/or practice |
| **5. ON WHOM PROCESS WAS SERVED:** | CT Corporation System, Boston, Massachusetts |
| **6. DATE AND HOUR OF SERVICE:** | By Process server on 02/01/2005 at 15:00 |
| **7. APPEARANCE OR ANSWER DUE:** | Within 20 Days |
| **8. ATTORNEY(S):** | Thomas M. Sobol<br>One Main Street<br>4th Floor<br>Cambridge, MA 02142 |
| **9. REMARKS:** | |

| | |
|---|---|
| **SIGNED** | CT Corporation System |
| **PER** | Yvette Concepcion |
| **ADDRESS** | 101 Federal Street<br>Boston, MA 02110<br>SOP WS 0006960910 |

Information contained on this transmittal form is recorded for C T Corporation System's record keeping purposes only and to permit quick reference for the recipient. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information that can be obtained from the documents themselves. The recipient is responsible for interpreting the documents and for taking the appropriate action.

# Commonwealth of Massachusetts



SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 05-0269

Commonwealth Care Alliance, Health
Care for All, Glen & Paula Crenshaw , Plaintiff(s)

v.

AstraZeneca Pharmaceuticals
L.P., AstraZeneca PLC, AstraZeneca US,
Zeneca, Inc., & Zeneca Holdings, Inc, Defendant(s)

## SUMMONS

To the above-named Defendant: Zeneca, Inc.

You are hereby summoned and required to serve upon Hagens Berman LLP

plaintiff's attorney, whose address is One Main Street, Fourth Floor , an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Barbara J. Rouse o, Esquire, at Boston, the 31st day of January , in the year of our Lord two thousand 05 .

*Michael Joseph Donovan*

Clerk/Magistrate

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.

2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED

(1) TORT   (2) MOTOR VEHICLE TORT   (3) CONTRACT   (4) EQUITABLE RELIEF   (5) OTHER

FORM CIV.P. 1 3rd Rev.

B.L.S.   05-0269

| PLAINTIFF(S) Commonwealth Care Alliance, Health Care for All, Glenn Crenshaw, Paula Crenshaw | DEFENDANT(S) Astra Zeneca Pharmaceuticals, L.P., Astra Zeneca PLC, Astra Zeneca US, Zeneca Inc., and Zeneca Holdings, Inc. |
|---|---|
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Thomas M. Sobol (BBO 471770) David S. Nalven (BBO 547220) Hagens Berman LLP, One Main Street, Board of Bar Overseers Number | ATTORNEY (if known) Harvey J. Wolkoff Ropes & Gray, One International Place, Boston, MA 02110 |

4th Floor, Cambridge, MA 02142      **Origin Code**

**Original Complaint**

### TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

CODE NO.          TYPE OF ACTION (specify)      TRACK      IS THIS A JURY CASE?
                                                       *
BH2          c. 93A Class Action ( B )      ( X ) Yes      ( ) No

**The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.**

This is a class action under G.L. c. 93A for false advertising and unfair and deceptive trade practices. Plaintiffs are consumers ~and third-party payors~ of the prescription drug Nexium. Defendants are the pharmaceutical manufacturer and related entities responsible for the marketing and sale of the drug. The complaint alleges that the defendants unlawfully sought to preserve their market share and profits as the patent on their blockbuster drug Prilosec was set to expire by manufacturing and marketing a nearly identical replacement drug, Nexium, and by initiating a massive and misleading advertising and promotional campaign to deceive consumers into purchasing Nexium. Consumers and third-party payors of prescription drugs overpaid by many millions of dollars as a result of defendants' unfair and deceptive conduct.

**\*A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.**

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT      None

**"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."**

Signature of Attorney of Record      _MW NW_      DATE: 1/25/05

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
TRIAL COURT DEPARTMENT

|  |  |
|---|---|
| COMMONWEALTH CARE ALLIANCE, HEALTH CARE FOR ALL, GLENN CRENSHAW, and PAULA CRENSHAW, individually and on behalf of persons similarly situated, | 05-0269 |
| Plaintiffs | Civil Action No. |
| v. | |
| ASTRAZENECA PHARMACEUTICALS L.P., ASTRAZENECA PLC, ASTRAZENECA US, ZENECA, INC., and ZENECA HOLDINGS, INC., | |
| Defendants. | |

## CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND

1. Plaintiffs, by their counsel, for their Class Action Complaint for Violations of Massachusetts General Laws Ch. 93A ("Complaint"), allege upon personal knowledge and belief as to their own acts, and upon information and belief (based on the investigation of counsel) as to all other matters, as to which allegations Plaintiffs believe substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery, on behalf of themselves and all others similarly situated, as follows:

## I.    NATURE OF THE ACTION

2. AstraZeneca Pharmaceuticals LP, AstraZeneca PLC, AstraZeneca US, Zeneca, Inc. and Zeneca Holdings, Inc. ("AstraZeneca") had a patent for the drug Prilosec, which by the year 2000 was the most prescribed drug in the world. Prilosec is a

1

proton pump inhibitor ("PPI") or acid pump inhibitor that is used to treat heartburn. By 2000, sales of Prilosec had reached $6 billion, making it the top selling drug in the world in terms of sales.

3. A patented drug is also referred to as a "brand name" drug. Brand name drugs that face no competition are the most profitable drugs for drug manufacturers. In the year 2000 the average retail price of a prescription drug was more than three times that of a generic drug.[1]

4. The patent for Prilosec was set to expire in 2001 and AstraZeneca anticipated that it would face stiff competition from generic manufacturers. It is a fact well known to drug manufacturers that entry of generics results in a substantial loss of market share, sharply reduced prices and a decrease in profits. AstraZeneca was facing the loss of its most profitable drug.

5. Within AstraZeneca, a group of marketers, lawyers and scientists was formed to come up with a solution for what the company believed was a looming patent-expiration disaster. The group called itself the Shark Fin Project after the dismal shape the sales chart would trace if it did nothing: an inverted V. In response, AstraZeneca launched a multi-prong attack. First it attacked generic manufacturers in court seeking to delay entry of competition. Second, shortly before the patent on Prilosec was set to expire, the company got FDA approval for the newly patented Nexium. Then it launched a massive advertising campaign to persuade Prilosec users and their doctors that Nexium was somehow better. Very quickly, Nexium became the most heavily advertised drug in the United States. The media was blanketed with Nexium ads – "Today's purple pill is Nexium, from the makers of Prilosec." To help with the switch, AstraZeneca originally priced Nexium below Prilosec, gave discounts to managed care plans and hospitals, barraged doctors with free samples, and even offered coupons in newspapers.

---

[1] *Trends as Indicators in the Charges*, Health Care Marketplace 2004 Update, Kaiser Family Foundation,.

AstraZeneca's 6,000 salespeople barraged doctors with studies proclaiming Nexium's superiority. The promotional campaign reportedly cost the company a half billion dollars in just 2001. Virtually overnight, Nexium – the new purple pill – began to replace Prilosec. Soon the company dropped all references to the older drug, Prilosec, in its advertisements. Now they just refer to "the purple pill called Nexium." It is as though Prilosec never happened. (In fact, Prilosec is now sold over the counter for a fraction of the cost of Nexium, Prilosec sells at $0.46 per pill and Nexium at over $4.00 per pill.)

6. To get FDA approval for Nexium, AstraZeneca had to test it in several clinical trials. Some of these trials merely compared Nexium with placebos to show that it worked better than nothing, since that is all the FDA requires. But four trials compared Nexium head to head with Prilosec (for esophageal erosions), and these were crucial to the marketing strategy. The company wanted to show that Nexium was better than Prilosec – an advance over the older drug.

7. Instead of comparing likely equivalent doses (which would have been no more than 20 and possibly as little as 10 milligrams of Nexium, versus the standard 20-milligram dose of Prilosec), the company used higher doses of Nexium. It compared 20 milligrams and 40 milligrams of Nexium with 20 milligrams of Prilosec. With the dice loaded in that way, Nexium looked like an improvement – but still only marginally so and in just two of the four trials. In fact, the only surprise is that at the high doses chosen for comparison, Nexium didn't do better than it did. The logical conclusion might have been simply to double the standard dose of Prilosec, allow generic competition, and forget about Nexium – but that would not have been of help to the profit-making objective of AstraZeneca.

8. AstraZeneca promoted Nexium to doctors and consumers as the "first proton pump inhibitor (PPI) to offer significant clinical improvements over Losec and its main competitor, lansoprazole, in terms of acid control and clinical efficacy."[2] It also claimed

---

[2] AstraZeneca Annual Report Form 20-F-2000 at p. 11.

that Nexium was more effective in acid inhibition than other comparable drugs and provided relief in a shorter period of time. AstraZeneca repeated this message in a barrage of marketing activities directed to patients and doctors.

9. To capture the market, AstraZeneca originally sold Nexium at prices below that of Prilosec. After Nexium was accepted by doctors and consumers AstraZeneca raised the price to roughly $4 per pill.

10. AstraZeneca's campaign worked. While sales of Prilosec fell in response to generic competition, sales of Nexium sky rocketed to reach $3.3 billion by 2003.

11. AstraZeneca's Nexium promotional and advertising campaign has resulted in billions of dollars of unnecessary drug expenditures at a time when rising drug prices have created a health care crisis in this country. AstraZeneca justified Nexium's superiority and effectiveness based on the previously noted clinical study sponsored by AstraZeneca that compared 40 mg. of Nexium to 20 mg. of Prilosec. From this study, which compared twice the dose of Nexium to the standard dose of Prilosec, AstraZeneca proclaimed Nexium's effectiveness. A dose of 40 mg. is not needed in most patients and a fair comparison of 20 mg. of Nexium to 20 mg. of Prilosec would not have proven Nexium to be superior. Treatment with Prilosec now costs about one eighth of the cost of Nexium and can be obtained over the counter. As a result of this misleading campaign, hundreds of thousands of patients have taken Nexium and continue to do so when they should not have, and billions in unnecessary prescription costs have been paid.

12. In 2003, the former administrator of the federal Centers for Medicare and Medicaid Services, Thomas A. Scully, stated to a convention of the American Medical Association: "You should be embarrassed if you prescribe Nexium because it increases costs with no medical benefits."[3] Mr. Scully noted "[t]he fact is Nexium is Prilosec ... [i]t is the same drug. It is a mirror compound." Mr. Scully further stated that *"Nexium is a game that is being played on the people who pay for drugs."*

---

[3] NEW YORK TIMES, April 21, 2003.

4

*13.* In this action Plaintiffs seek restitution and equitable relief arising out of AstraZeneca's sale and promotion of Nexium pursuant to practices and acts that are unfair, deceptive and unlawful in violation of Mass. Gen. Laws ch. 93A *et seq.*

## II.    PARTIES

14. Plaintiff Commonwealth Care Alliance ("CCA") is a prepaid care system contracting with Medicare and Massachusetts Medicaid to provide comprehensive care to vulnerable, high cost populations. It is located in Boston, Massachusetts. CCA is third-party payor that paid for Nexium on behalf of its beneficiaries during the Relevant Period, and was injured by the illegal conduct described in this Complaint. CCA has standing to bring this action on behalf of itself and all other third-party payors who paid for Nexium in or purchased in the Commonwealth of Massachusetts.

15. Plaintiff Health Care For All ("HCFA") is a consumer health advocacy organization that has led the fight in Massachusetts to expand access to affordable, quality health care since 1985. It is located in Boston, Massachusetts. HCFA's members purchase and have purchased Nexium during the Relevant Period, and were injured by the illegal conduct described in this Complaint. As an organizational plaintiff, HCFA has standing to bring this action on behalf of itself and all consumers in the Commonwealth of Massachusetts.

16. Plaintiff Glenn Crenshaw is a resident of the Commonwealth of Massachusetts residing in Everett, Massachusetts. During the Relevant Period, Glenn Crenshaw purchased Nexium and was injured by the illegal conduct described in this Complaint. Specifically, he took Nexium for approximately one year during which he

paid co-payments through his insurance plan. As an individual, Glenn Crenshaw pursues this class action on behalf of himself and all those similarly situated.

17. Plaintiff Paula Crenshaw is a resident of the Commonwealth of Massachusetts residing in Everett, Massachusetts. During the Relevant Period, Paula Crenshaw purchased Nexium and was injured by the illegal conduct described in this Complaint. Specifically, she took Nexium for at least one year to treat reflux disease. Paula Crenshaw paid co-payments through her insurance plan. As an individual, Paula Crenshaw pursues this class action on behalf of herself and all those similarly situated.

18. Defendant AstraZeneca Pharmaceuticals L.P. is a Delaware corporation, with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware. AstraZeneca Pharmaceuticals L.P. is owned and controlled by AstraZeneca PLC, a public limited liability company domiciled in the United Kingdom.

19. Defendant AstraZeneca US is a Delaware corporation with its principal place of business at 1800 Concord Pike, Wilmington, Delaware.

20. Defendant Zeneca, Inc. ("Zeneca") is a Delaware corporation with its principal place of business at Malvern, Pennsylvania. Zeneca is a wholly owned subsidiary of AstraZeneca, PLC, a limited liability company domiciled in the United Kingdom.

21. Defendant Zeneca Holdings, Inc. ("Zeneca Holdings") is a Delaware corporation and wholly owned subsidiary of AstraZeneca, PLC, a limited liability company domiciled in the United Kingdom, engaged in the marketing and production of defendants' products.

22. AstraZeneca Pharmaceuticals L.P., AstraZeneca, PLC, AstraZeneca U.S., Zeneca, Inc., and Zeneca Holdings, Inc. are collectively referred to as "AstraZeneca."

23. AstraZeneca maintains research and development and manufacturing facilities worldwide, including in the United States. AstraZeneca reported annual sales of $16.5 billion in 2001, with an operating profit of $4.2 billion.

## III.   JURISDICTION AND VENUE

24. Plaintiffs bring this class action under Mass. Gen. Laws ch. 93A, *et seq.* for false advertising and unfair and deceptive trade practices, for monetary, declaratory and injunctive relief as well as reasonable attorneys' fees and costs with respect to injuries sustained by Plaintiffs and members of the Class arising from violations by Defendants.

25. This Court has subject matter jurisdiction over all causes of action asserted herein pursuant to Mass. Gen. Laws ch. 212 § 4. This Court has personal jurisdiction over the parties because Plaintiffs and the members of the Class submit to the jurisdiction of this Court and Defendants systematically and continually conduct business in, or otherwise intentionally avails itself of, the Massachusetts marketplace through the production, promotion, sale, marketing and distribution of its products and services in Massachusetts. Mass. Gen. Laws ch. 223A § 3.

26. Venue is proper in this Court because Plaintiffs reside in Suffolk County and Defendants conduct business in Suffolk, including marketing, advertising and sales directed at Massachusetts residents, and maintain their agent for service of process in Suffolk County. Mass. Gen. Laws ch. 223 § 1.

27. Plaintiffs, through counsel, have sent by certified mail a demand for relief to AstraZeneca Pharmaceuticals LP, AstraZeneca LP, and Zeneca Holdings, Inc. pursuant to Mass. Gen. Laws ch. 93A reasonably identifying one or more of the claimants and reasonably describing the unfair and deceptive acts and practices committed by AstraZeneca alleged herein, and the injury suffered. AstraZeneca, through counsel,

1798.10 0007 BSC.DOC

responded without tender of settlement. More than 30 days has passed since the demand letter was sent.

## IV.    FACTUAL ALLEGATIONS

### A.    Prilosec – A Blockbuster Drug for AstraZeneca

28. Prilosec (also known as Losec) is a proton pump inhibitor and, according to AstraZeneca's publicly filed documents, by the year 2000 had "set a new global standard in short and long-term treatment of acid related diseases." According to AstraZeneca's publicly filed documents, Prilosec has benefited patients in 530 million patient treatments since 1980 and "is the world's largest selling pharmaceutical." Prilosec was AstraZeneca's most profitable drug with worldwide sales of over $6 billion by 2000.[4]

29. Patent protection for omeprazole, the active substance in Prilosec, expired in all major markets by the end of 2000, but patent term extensions extended protection until April 2001 in the United States.

30. With the looming loss of patent protection, AstraZeneca faced the erosion of its number one drug. To put this in perspective, sales of Prilosec of $5.9 billion in 2000 comprised 39% of AstraZeneca's revenue, with the next drug at 8%.

### B.    The Loss of Patent Protection Results in Lower Prices and Reduced Profits

31. For every year from 1995 through 2002, the pharmaceutical industry was the most profitable industry in the United States, although its profitability declined somewhat in 2002. In 2003, drug companies ranked as the third most profitable industry (14.3%), with mining, crude-oil production the most profitable industry (20.1%) and commercial banks the second most profitable (18.6%). Drug companies were more than three times

---

[4] 2001 Annual Report at p. 38.

as profitable as the median for all Fortune 500 companies in 2003 (14.3% compared to 4.6%).[5]

32. The most profitable drugs are brand name drugs. Brand name drugs typically sell at three times or more than that of a generic drug.

### C.   The AstraZeneca Solution – The New Purple Pill Nexium

33. Faced with the catastrophic loss of sales from its flagship drug, AstraZeneca carefully plotted a new strategy. The plotting was done by the Shark Fin Project, a group of marketers, lawyers and scientists charged with developing a strategy for averting the patent expiration disaster. The name of the group derives from the dismal shape the sales chart would trace if AstraZeneca did nothing: an inverted V. Eventually the centerpiece of that strategy was the marketing and promotion of the new drug Nexium. Nexium was viewed by several executives as the poorest solution because it was not any better for ordinary heartburn than Prilosec.

34. AstraZeneca's plan was to promote Nexium as an improvement to Prilosec and to have brand loyalty built before the expiration of Prilosec's patents. AstraZeneca knew that brand loyalty is critical – once a doctor locks onto a drug for a certain treatment – he/she is unlikely to change. The same is true for the consumer.

35. AstraZeneca sponsored several studies to justify use of Nexium. The study that it used to obtain FDA approval concluded that Nexium *at twice* the standard dose of Prilosec was *slightly* more effective:

> Investigators observed that the time intragastric pH was greater than four during a 24-hour period was longer with **Nexium 40 mg** once daily than standard healing doses for erosive esophagitis of four other branded proton pump inhibitors currently available by prescription in the United States. On day five, intragastic pH was maintained above 4.0 for a mean of 14.0 hours with **Nexium 40** mg, 12.1 hours with Aciphex 20 mg, 11.8 hours with **Prilosec 20** mg, 11.5 hours with Prevacid 30 mg, and 10.1 hours with Protonix 40 mg. **Nexium** also provided a significantly higher percentage of

---

[5] *Trends as Indicators in the Charges*, Health Care Marketplace 2004 Update, Kaiser Family Foundation.

patients with an intragastric pH > 4.0 for > 12 hours relative to the other proton pump inhibitors (p<0.05).

36. AstraZeneca did not publish a clinical study of the effectiveness of 20 mg of Nexium versus 20 mg of Prilosec. This study found that Nexium was not more effective than Prilosec.

37. AstraZeneca did not publish the negative study or a negative study comparing 40 mg of Nexium and 20 mg of Prilosec.

### D.    A Massive Promotional Campaign and Predatory Price Is Used to Establish Nexium

38. After the sponsored study was concluded, AstraZeneca used the study to promote Nexium as a superior product.

39. For example, in its 2000 Annual Report, AstraZeneca claimed that:

- *Nexium* is the first PPI to offer significant clinical improvements over *Losec* in terms of acid control and clinical efficacy, shown in clinical studies involving over 30,000 patients performed across 20 countries. It is expected to establish a new, improved treatment standard for the PPI class.

- *Nexium* offers more effective acid inhibition than other PPIs and in the treatment of reflux oesophagitis, provides healing and symptom relief in more patients and in a shorter period of time than *Losec*. It is an effective, long-term therapy for GERD patients and can be taken when needed (on demand) to prevent relapse. For the treatment of active duodenal ulcers, seven-day *Nexium* triple therapy (in combination with two antibiotics for the eradication of H.pylori) heals most patients without the need for follow-up antisecretory monotherapy.

40. AstraZeneca used these themes in a massive promotional campaign launched to have Nexium replace Prilosec as its flagship drug. AstraZeneca sales representatives spent 2000 and 2001 in a frenzied sales pitch as to the superior qualities of Nexium. In the first ten months of 2001 alone, AstraZeneca spent $98 million on direct-to-consumer promotions, again claiming Nexium was superior to Prilosec.

41. Nexium advertisements directed to physicians claimed that the new drug was more powerful than Prilosec: "we've captured the essence of Prilosec and created a new PPI ... introducing Nexium the powerful new PPI from the makers of Prilosec...."

42. Its 6000 person sales force flooded doctors' offices with free samples and claims of Nexium's superiority. A July 6, 2002 *Wall Street Journal* article depicts one type of pitch made to doctors:

> Peter Halper, an internist at a large group practice in Manhattan, has a computer given him by a drug-marketing firm on condition he chat with drug-company marketers via the Internet from time to time. Recently, he checked in with AstraZeneca. The face of a salesman popped onto his screen, asking him how he was and then launching into a pitch for Nexium.
>
> Dr. Halper asked the salesman why Nexium was better.
>
> "The proof's in the healing rates," said the live salesman, who cited data comparing 40 mg. of Nexium to 20 mg. of Prilosec. 'We're safer, with no drug-to-drug interactions. We're also the No. 1 proton-pump inhibitor among gastrointestinal specialists.' While he spook, several graphs flashed on the screen.
>
> 'So have I shown you how we differ from the other drugs?' the salesman asked. Dr. Halper said he had. 'Do you need any more samples delivered?' No, Dr. Halper said, he had plenty.
>
> Minutes later, two salesmen from AstraZeneca arrived to talk to Dr. Halper about Nexium. They made sure to restock his cabinet with free Nexium. Since many physicians view Prilosec and Nexium as virtually identical, they often prescribe whichever one is in their free-sample closet. Patients who begin with free samples often continue with paid prescriptions, so the freebies are effective marketing tools.

43. No mention in this sales pitch was made of the fact at equivalent doses Nexium was not effective, nor was the claim of "superiority" accurate in that the clinical study showed just a slight increase in efficacy for only one type of patient and that one of the trials showed no increase in efficacy.

44. AstraZeneca also engaged in a massive advertising campaign directed at consumers. The intent of these advertisements is to cause consumers to want to use Nexium. Studies show that such advertisements are effective in causing patients to pressure doctors into prescribing expensive and marginally helpful new drugs. Doctors do not want to alienate patients and find it easier and faster to write the prescription than

to explain cheaper alternatives. This is why such direct-to-consumer advertising is prohibited in every other developed country (except New Zealand).

45. The promotional campaign was massive in terms of spending and effort:

- To promote **Nexium,** AstraZeneca retained the professional and consumer advertising agencies that handle the **Prilosec** promotion. The professional ad agency of record for **Nexium** is Grey Healthcare Group Inc. (ghgroup.com). Klemtner Advertising Inc., a division of Nelson Communications' Healthcare Resources Group Inc., is the consumer advertising agency of record.

- AstraZeneca last year spent $ 97.9 million on the consumer campaign for **Nexium** through October, placing the product as the third most-promoted prescription drug to consumers during this period. This amount was 84.4% of AstraZeneca's total expenditure for direct-to-consumer advertising in the first 10 months of the year. The company's direct-to-consumer campaign expenditure for **Nexium** totaled more than the entire consumer advertising efforts in that period for Abbott Laboratories (abbott.com), Eli Lilly & Co. (lilly.com), and Novartis (novartis.com). Nexium was the fourth most-promoted drug in medical journals in 2001, according to Perq/HCl (www.perqhciresearch.com)

46. The effectiveness of such advertising was not lost on AstraZeneca. A Kaiser Family Foundation study found that:

- Nearly a third (30%) of adults have talked to their doctor about a drug they saw advertised, and 44% of those who talked to their doctor received a prescription for the mediation they inquired about. This means that one in eight Americans (13%) has received a specific prescription in response to seeing a drug ad.

- After viewing specific prescription drug ads, about four in ten  said they were very or somewhat likely to talk to their doctor about the drug they saw advertised (37%) and/or to talk to their doctor about the health condition mentioned in the ad (40%).

47. Millions of patients including those in Massachusetts were exposed to advertisements for Nexium.

48. AstraZeneca also engaged in what would, if Prilosec was manufactured by another company, be predatory pricing in violation of federal and state antitrust law. It offered Nexium at prices below the price of its own Prilosec, hoping that if it established

Nexium as a replacement with doctors and consumers, it could later raise the price of Nexium and reap substantial profit after Prilosec's patent had expired.

### E.     Nexium Is Not More Effective

49. The truth is that there is no evidence that Nexium is superior, at standard doses, to Prilosec and other PPIs:

> However, it appears that AstraZeneca, the manufacturer of Prilosec, has been remarkably successful in switching consumers to its newer and more expensive PPI:  Nexium (esomeprazole),"the purple pill." Sales of esomeprazole (both brand name Prilosec and generic) declined from $4 billion (February 2002 to January 2003) to $2.9 billion (February 2003 to January 2004), while sales of Nexium increased from $2.3 billion to $3.6 billion for the same time frame. The number of omeprazole (brand name and generic) prescriptions declined from 21.5 million to 17.1 million for those time periods, while the number of Nexium prescriptions increased from 15.1 million to 21.3 million, according to NDCHealth.

> Drugs for Peptic Ulcers

> This is remarkable since there is no evidence that Nexium is any more effective than Prilosec. The two medications are close chemical relatives. Prilosec is made up of two molecules which are mirror images of each other, while Nexium is made of one of those same molecules. Clinical trials found that 20 mg or 40 mg of Nexium is somewhat more effective than 20 mg of Prilosec in healing erosive lesions. However, no tests were done to compare 40 mg of Nexium against 40 mg of Prilosec. "Some patients may need 20 mg while some need 40 mg," Dr. Abramowicz says. "When optimal doses are used, Prilosec and generic omeprazole appear to be as effective as Nexium or any other PPI." *(Source:  Managed Healthcare Executive April 1, 2004)*

50. The situation was described by *Health Facts*  as follows:

> It's tempting to dismiss Nexium as just another "me too" drug, one chemical notch away from the other PPIs, and one more example of a pharmaceutical company trying to make us think it has come up with something new. But actually Nexium signals a new pharmaceutical industry twist. Normally, a company makes a me-too drug to cut into a competitor's profits, but in this case, both

13

Prilosec and Nexium are made by the same company. AstraZeneca's reason for competing with its own product is obvious. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████.

Gone is the pretense that carried the day for Prozac's competitors, who claimed that their me-too antidepressants (Zoloft, Paxil, etc.) had fewer side effects. There is no significant difference in side effects between Prilosec and Nexium. Both drugs come in delayed-release form, so AstraZeneca has not introduced a new format. In fact, ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████.

51. The *Los Angeles Times* described the marketing of Nexium as follows:

As an example, Cohen **compares Nexium,** the new stomach-acid controller, to **Prilosec,** which is virtually identical and for which a generic is available for a price about 10 times less. But once a patient tries **Nexium** and is doing well, he's not going to want to switch, Cohen says. "Every dollar that goes into these 'me-too' drugs that are virtually the same as existing drugs is a dollar that is bled out of the health-care system. Drug companies are looking for their profits and will squeeze it every way they can." *(Source: Los Angeles Times February 15, 2004)*

52. CMS Administrator Tom Scully in 2003 told physicians at a convention of the American Medical Association that they should not prescribe the heartburn treatment **Nexium** because **Prilosec,** an older version of the medication that became available in generic form in December 2002, costs less and provides the same level of treatment. Mr. Scully told doctors, "[y]ou should be embarrassed if you prescribed **Nexium,**" because it increases costs with no medical benefits. "The fact is, Nexium is Prilosec," Mr. Scully said. "It is the same drug. It is a mirror compound." Mr. Scully said he had no problem paying thousands of dollars a year for an innovative drug that saves lives, like Gleevec, for certain types of leukemia and gastrointestinal tumors. But he said, *"Nexium is a game that is being played on the people who pay for the drugs making it one of the most successful launches ever of a new medicine."*[6]

---

[6] 2003 Annual Report, Chief Executive's Overview.

### F.    AstraZeneca's Marketing Campaign Has Been Successful:  Nexium's Price Increased and Sells Billions Per Year

53. Sales of Prilosec have plummeted in response to generic competition.  In its 2003 Annual Report, AstraZeneca's Chief Executive boasted of the transformation from Prilosec to Nexium, trumpeting the $3.3 billion in Nexium sales achieved in less than three years "after its introduction."

54. Having established Nexium's position and capitalizing on brand loyalty, AstraZeneca then raised the price of Nexium.  It now sells for $4.09 per pill versus $0.46 per pill for Prilosec.

55. A recap of Prilosec and Nexium sales reveals the success of Nexium in replacing Prilosec (data for 2004 only includes first six months of that year):

### PRILOSEC VS NEXIUM SALES RECORDS
### 1998 THROUGH 1st HALF 2004

| YEAR | WORLDWIDE PRILOSEC/LOSEC | U.S. PRILOSEC | WORLDWIDE NEXIUM | U.S NEXIUM |
|---|---|---|---|---|
| 1998 | 4,845,000,000 [7] | | -- | -- |
| 1999 | 5,909,000,000 [8] | | -- | -- |
| 2000 | 6,260,000,000 [9] | | 17,000,000 [10] | Launched |
| 2001 | 5,684,000,000 [11] | 3,694,000,000 [12] | 580,000,000 [13] | 456,000,000 [14] |
| 2002 | 4,623,000,000 [15] | 2,847,000,000 [16] | 1,978,000,000 [17] | 1,525,000,000 [18] |

---

[7] Source:  2000 Annual Report p. 41.

[8] *Ibid.*

[9] Source:  2000 Annual Report p. 38.

[10] Source:  2001 Annual Report p. 7.

[11] Source:  2001 Annual Report p. 7.

[12] Source:  2001 Profit & Loss Statement p. 7.

[13] Source:  2001 Annual Report p. 7.

[14] Source:  2001 Annual Report pp. 34, 36.

[15] Source:  2002 Annual Report p. 9.

[16] Source:  2002 Profit & Loss Statement p. 8.

[17] Source:  2002 Annual Report p. 9.

[18] Source:  2002 Profit & Loss Statement p. 8.

15

| YEAR | WORLDWIDE PRILOSEC/LOSEC | U.S. PRILOSEC | WORLDWIDE NEXIUM | U.S NEXIUM |
|---|---|---|---|---|
| 2003 | 2,565,000,000 [19] | 867,000,000 [20] | 3,300,000,000 [21] | 2,477,000,000 [22] |
| 2004 | 1,071,000,000 [23] | 208,000,000 [24] | 1,826,000,000 [25] | 1,280,000,000 [26] |

## V.    CLASS ALLEGATIONS

56. Plaintiffs bring this action on behalf of themselves and a class defined as follows:  All persons or entities in Massachusetts who purchased Nexium in the four (4) years preceding the filing of this Complaint up to and including the present.

57. The Class consists of tens or hundreds of thousands of individuals and entities throughout Massachusetts, making individual joinder impractical.  The disposition of the claims of the Class members in a single class action will provide substantial benefits to all parties and to the Court.

58. The claims of the representative Plaintiffs are typical of the claims of the Class because they, like all Class members, have purchased Nexium and have been harmed by Defendants' misconduct because they would not have purchased Nexium had they known the truth.

59. The factual and legal bases of Defendants' misconduct are common to all Class members and represent a common thread of deception and other misconduct resulting in injury to Plaintiffs and all members of the Class.

60. There are many questions of law and fact common to Plaintiffs and the Class, and those questions substantially predominate over any questions that may affect

---

[19] Source:  2003 Annual Report pp. 5, 13.

[20] Source:  Consolidated Profit & Loss p. 18.

[21] Source:  2003 Annual Report pp. 1, 13.

[22] Source:  2003 Annual Report p. 13.

[23] Source:  2004 Second Quarter Product Sales p. 17.

[24] Ibid.

[25] Ibid.

[26] Ibid.

1793. 10 0007 BSC.DOC

individual Class members. Common questions include, but are not limited to, the

following:

a.  Whether Defendants' active concealment of and/or failure
    to disclose the true nature of Nexium was likely to mislead
    or deceive within the meaning of M.G.L. c.93A *et seq.*;

b.  Whether Defendants' active concealment of and/or failure
    to disclose the true nature of Nexium is unfair within the
    meaning of M.G.L. c.93A *et seq.*, in that the harm to
    consumers and the public of such conduct outweighs its
    benefits;

c.  Whether Defendants' active concealment of and/or failure
    to disclose the true nature of Nexium is unlawful within
    the meaning of M.G.L. c.93A *et seq.*, in that it constitutes
    a violation of M.G.L. c.93A *et seq.*;

d.  Whether Defendants engaged in false advertising within
    the meaning of M.G.L. c.93A *et seq.* when it represented,
    through its advertisements, promotions and other
    representations, that Nexium had characteristics that it
    does not actually have or omitted to disclose material facts
    regarding Nexium's actual characteristics;

e.  Whether Defendants should be declared financially
    responsible for notifying all Class members of the true
    nature of Nexium; and

f.  Whether Defendants should be ordered to disgorge, for the
    benefit of the Class, all or part of its ill-gotten profits
    received from the sale of Nexium, and/or to make
    restitution to Plaintiffs and the members of the Class.

61. Plaintiffs will fairly and adequately represent and protect the interests of the

Class. Plaintiffs have retained counsel with substantial experience in prosecuting

consumer class actions, including actions involving pharmaceutical sales. Plaintiffs and

their counsel are committed to vigorously prosecuting this action on behalf of the Class,

and have the financial resources to do so. Neither Plaintiffs nor their counsel have any

interests adverse to those of the Class.

62. Plaintiffs and the members of the Class suffered, and will continue to suffer,

harm as a result of Defendants' unlawful and wrongful conduct. A class action is

superior to other available methods for the fair and efficient adjudication of the

controversy. Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. Because of the relatively small size of each individual Class member's claims, few Class members likely could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class members will continue to suffer harm and Defendants' misconduct will proceed without remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. Additionally, Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Class and require Court imposition of relief as to the Class as a whole.

## FIRST CAUSE OF ACTION

### Unfair and Deceptive Practices
### (M.G.L. c.93A, *et seq.*)

63. The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein. Plaintiffs assert this claim on behalf of themselves and members of the Class.

64. Defendants' actions, as complained of herein, constitute unfair, deceptive, and unlawful practices committed in violation of M.G.L. c.93A *et seq.*

65. Defendants actions constitute unfair and deceptive acts, undertaken willfully and knowingly. They include:

66. Defendants' promotion of Nexium as "more powerful," "offering significant improvements over Prilosec," and as being "more effective" were false and/or misleading in that except for rare patients none of the above are true; in comparable doses Nexium is not more effective, is far more expensive than comparable drugs and in fact Nexium was promoted solely for financial reasons and not due to any material increase in medical efficacy.

67. Defendants' conduct was unfair in that by promoting Nexium directly to consumers, without disclosure of the above, who have inferior knowledge and sophistication, Defendants created demand for Nexium that would not have existed if Defendants had disclosed the true cost and benefits of Nexium versus Prilosec and/or other PPIs; and

68. Defendants omitted material information known to them that would have disclosed materially adverse facts to doctors and consumers in order to induce doctors to prescribe Nexium and consumers to purchase Nexium.

69. As a result of Defendant's conduct in violation of the Mass. Gen. L. Ch. 93A, *et seq.*, plaintiffs have been harmed.

70. Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of such unfair practices, as provided in M.G.L. c.93A, and for such other relief as set forth below.

## SECOND CAUSE OF ACTION

### Unfair and Deceptive Practices - False Advertising
### (M.G.L. c.93A, *et seq.* and 940 CMR § 3.02, as promulgated thereunder )

71. The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Class.

72. Defendants' actions, as complained of herein, constitute false advertising in violation of 940 CMR § 3.02, as promulgated pursuant to M.G.L. c.93A § 2(a) for purposes of determining whether conduct, terminology or representations involve unfair methods of competition or unfair or deceptive acts or practices.

73. 940 CMR § 3.02 provides that "No statement or illustration shall be used in any advertising which creates a false impression of the...quality, make...or origin of the product offered, or which may otherwise misrepresent the product in such a manner that

later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised product to another."

74. As a result of the violations of 940 CMR § 3.02 described above, Defendants have been, and will be, unjustly enriched at the expense of Plaintiffs and the general public. Specifically, Defendants have been unjustly enriched by their receipt of monies received from customers who purchased Nexium, which is advertised and/or otherwise marketed in this State and was promoted and sold through advertising and marketing materials that materially misrepresent the quality and functions of the product.

75. Pursuant 940 CMR § 3.02, as promulgated under M.G.L. c.93A, *et. seq.*, as Plaintiffs are suing on behalf of themselves and members of the Class, Plaintiffs are entitled to the remedies set forth below.

### THIRD CAUSE OF ACTION

#### Unfair and Deceptive Practices - Deceptive Pricing
#### (M.G.L. c.93A, *et seq.* 940 CMR § 3.04, as promulgated thereunder)

76. The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Class.

77. Defendants' actions, as complained of herein, constitute deceptive pricing in violation of 940 CMR § 3.04, as promulgated pursuant to M.G.L. c.93A § 2(a) for purposes of determining whether conduct, terminology or representations involve unfair methods of competition or unfair or deceptive acts or practices.

78. 940 CMR § 3.04 provides that "No claim or representation shall be made by any means which has the capacity or tendency or effect of deceiving buyers or prospective buyers as to the value or the past, present, common or usual price of a product, or as to any reduction in price of a product, or any savings relating to a product."

79. As a result of the violations of 940 CMR § 3.04 described above, Defendants have been, and will be, unjustly enriched at the expense of Plaintiffs and the general

public. Specifically, Defendants have been unjustly enriched by their receipt of monies received from customers who purchased Nexium, which is advertised and/or otherwise marketed in this State and was promoted and sold through advertising and marketing materials that materially misrepresent the quality and functions of the product.

80. Pursuant 940 CMR § 3.04, as promulgated under M.G.L. c.93A, *et. seq.*, as plaintiffs are suing on behalf of themselves and members of the Class, Plaintiffs are entitled to the remedies set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Class request that the Court enter an order or judgment against Defendants as follows:

    A. Certification of the Class and appointment of Plaintiffs as Class Representatives and Plaintiffs' counsel of record as Class Counsel.

    B. Damages for the harm caused by its unlawful conduct, calculated as the actual damages determined at trial or $25 per sale of Nexium in Massachusetts, whichever is greater.

    C. Treble damages and all other penalties pursuant to Mass. Gen. L. Ch. 93A, *et seq.*

    D. Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendants as a result of the unfair, unlawful and/or deceptive conduct alleged in this Complaint;

    E. Prejudgment and post-judgment interest on such monetary relief, awarded in accordance with Massachusetts law;

    F. Appropriate injunctive relief;

    G. An order awarding Plaintiffs the costs of bringing this suit, including attorneys' fees; and

H.  All other relief to which Plaintiffs and members of the Class may be
    entitled at law or in equity.

HAGENS BERMAN LLP

By_____*MV Nm/*_____

Thomas M. Sobol, BBO no. 471770
David S. Nalven, BBO no. 547220
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700

Steve W. Berman
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292

Attorneys for Plaintiffs

DATED: January 25, 2005

22

⊕
CT System

**Service of Process Transmittal Form**

Boston, Massachusetts

**02/01/2005**

**Via Federal Express (Overnight)**

**TO:** AstraZeneca Pharmaceuticals LP
Legal Department (FOP3)
1800 Concord Pike
Wilmington, DE 19850

**RE:** **PROCESS SERVED IN MASSACHUSETTS**

**FOR** AstraZeneca Pharmaceuticals LP Domestic State: De

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

| | |
|---|---|
| **1. TITLE OF ACTION:** | Commonwealth Care Alliance, et al., Pltf.  vs AstraZeneca Pharmaceuticals L.P., et al., Deft. |
| **2. DOCUMENT(S) SERVED:** | Summons, Complaint |
| **3. COURT:** | Commonwealth of Massachusetts, Suffolk Superior Court |
| | Case Number 05-0269 |
| **4. NATURE OF ACTION:** | Deception and other misconduct resulting in personal injury/unlawful and wrongful conduct/Unfair and deceptive business acts and/or practice |
| **5. ON WHOM PROCESS WAS SERVED:** | CT Corporation System, Boston, Massachusetts |
| **6. DATE AND HOUR OF SERVICE:** | By Process server on 02/01/2005 at 15:00 |
| **7. APPEARANCE OR ANSWER DUE:** | Within 20 Days |
| **8. ATTORNEY(S):** | Thomas M. Sobol |
| | One Main Street |
| | 4th Floor |
| | Cambridge, MA 02142 |

**9. REMARKS:**

| | |
|---|---|
| **SIGNED** | CT Corporation System |
| **PER** | Yvette Concepcion |
| **ADDRESS** | 101 Federal Street |
| | Boston, MA 02110 |
| | SOP WS 0006960884 |

Information contained on this transmittal form is recorded for C T Corporation System's record keeping purposes only and to permit quick reference for the recipient. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information that can be obtained from the documents themselves. The recipient is responsible for interpreting the documents and for taking the appropriate action.

# Commonwealth of Massachusetts

SUFFOLK, ss.



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 05-0269

Commonwealth Care Alliance, Health
Care for All, Glen & Paula Crenshaw , Plaintiff(s)

v.

AstraZeneca Pharmaceuticals
L.P., AstraZeneca PLC, AstraZeneca US,
Zeneca, Inc., & Zeneca Holdings, Inc., Defendant(s)

## SUMMONS

To the above-named Defendant: AstraZeneca Pharmaceuticals L.P.

You are hereby summoned and required to serve upon  Hagens Berman LLP

plaintiff's attorney, whose address is  One Main St., Fourth Floor , an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, **Barbara J. Rouse** ~~Suzanne V. DelVecchio~~, Esquire, at Boston, the        31st                 day of
January                 , in the year of our Lord two thousand        05                   .

*Michael Joseph Donovan*

Clerk/Magistrate

NOTES
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure

2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED

(1) TORT    (2) MOTOR VEHICLE TORT —  (3) CONTRACT  —  (4) EQUITABLE RELIEF - (5) OTHER

FORM CIV.P. 1 3rd Rev.

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.**

**SUPERIOR COURT
TRIAL COURT DEPARTMENT**

COMMONWEALTH CARE ALLIANCE,
HEALTH CARE FOR ALL, GLENN
CRENSHAW, and PAULA CRENSHAW,
individually and on behalf of persons
similarly situated,

Plaintiffs

v.

ASTRAZENECA PHARMACEUTICALS
L.P., ASTRAZENECA PLC, ASTRAZENECA
US, ZENECA, INC., and ZENECA
HOLDINGS, INC.,

Defendants.

**05-0269**

Civil Action No.

## CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND

1. Plaintiffs, by their counsel, for their Class Action Complaint for Violations of

Massachusetts General Laws Ch. 93A ("Complaint"), allege upon personal knowledge

and belief as to their own acts, and upon information and belief (based on the

investigation of counsel) as to all other matters, as to which allegations Plaintiffs believe

substantial evidentiary support will exist after a reasonable opportunity for further

investigation and discovery, on behalf of themselves and all others similarly situated, as

follows:

## I.    NATURE OF THE ACTION

2. AstraZeneca Pharmaceuticals LP, AstraZeneca PLC, AstraZeneca US,

Zeneca, Inc. and Zeneca Holdings, Inc. ("AstraZeneca") had a patent for the drug

Prilosec, which by the year 2000 was the most prescribed drug in the world. Prilosec is a

proton pump inhibitor ("PPI") or acid pump inhibitor that is used to treat heartburn. By 2000, sales of Prilosec had reached $6 billion, making it the top selling drug in the world in terms of sales.

3.  A patented drug is also referred to as a "brand name" drug. Brand name drugs that face no competition are the most profitable drugs for drug manufacturers. In the year 2000 the average retail price of a prescription drug was more than three times that of a generic drug.[1]

4.  The patent for Prilosec was set to expire in 2001 and AstraZeneca anticipated that it would face stiff competition from generic manufacturers. It is a fact well known to drug manufacturers that entry of generics results in a substantial loss of market share, sharply reduced prices and a decrease in profits. AstraZeneca was facing the loss of its most profitable drug.

5.  Within AstraZeneca, a group of marketers, lawyers and scientists was formed to come up with a solution for what the company believed was a looming patent-expiration disaster. The group called itself the Shark Fin Project after the dismal shape the sales chart would trace if it did nothing: an inverted V. In response, AstraZeneca launched a multi-prong attack. First it attacked generic manufacturers in court seeking to delay entry of competition. Second, shortly before the patent on Prilosec was set to expire, the company got FDA approval for the newly patented Nexium. Then it launched a massive advertising campaign to persuade Prilosec users and their doctors that Nexium was somehow better. Very quickly, Nexium became the most heavily advertised drug in the United States. The media was blanketed with Nexium ads – "Today's purple pill is Nexium, from the makers of Prilosec." To help with the switch, AstraZeneca originally priced Nexium below Prilosec, gave discounts to managed care plans and hospitals, barraged doctors with free samples, and even offered coupons in newspapers.

---

[1] *Trends as Indicators in the Charges*, Health Care Marketplace 2004 Update, Kaiser Family Foundation,.

AstraZeneca's 6,000 salespeople barraged doctors with studies proclaiming Nexium's superiority. The promotional campaign reportedly cost the company a half billion dollars in just 2001. Virtually overnight, Nexium – the new purple pill – began to replace Prilosec. Soon the company dropped all references to the older drug, Prilosec, in its advertisements. Now they just refer to "the purple pill called Nexium." It is as though Prilosec never happened. (In fact, Prilosec is now sold over the counter for a fraction of the cost of Nexium, Prilosec sells at $0.46 per pill and Nexium at over $4.00 per pill.)

6. To get FDA approval for Nexium, AstraZeneca had to test it in several clinical trials. Some of these trials merely compared Nexium with placebos to show that it worked better than nothing, since that is all the FDA requires. But four trials compared Nexium head to head with Prilosec (for esophageal erosions), and these were crucial to the marketing strategy. The company wanted to show that Nexium was better than Prilosec – an advance over the older drug.

7. Instead of comparing likely equivalent doses (which would have been no more than 20 and possibly as little as 10 milligrams of Nexium, versus the standard 20-milligram dose of Prilosec), the company used higher doses of Nexium. It compared 20 milligrams and 40 milligrams of Nexium with 20 milligrams of Prilosec. With the dice loaded in that way, Nexium looked like an improvement – but still only marginally so and in just two of the four trials. In fact, the only surprise is that at the high doses chosen for comparison, Nexium didn't do better than it did. The logical conclusion might have been simply to double the standard dose of Prilosec, allow generic competition, and forget about Nexium – but that would not have been of help to the profit-making objective of AstraZeneca.

8. AstraZeneca promoted Nexium to doctors and consumers as the "first proton pump inhibitor (PPI) to offer significant clinical improvements over Losec and its main competitor, lansoprazole, in terms of acid control and clinical efficacy."[2] It also claimed

---

[2] AstraZeneca Annual Report Form 20-F-2000 at p. 11.

that Nexium was more effective in acid inhibition than other comparable drugs and provided relief in a shorter period of time. AstraZeneca repeated this message in a barrage of marketing activities directed to patients and doctors.

9. To capture the market, AstraZeneca originally sold Nexium at prices below that of Prilosec. After Nexium was accepted by doctors and consumers AstraZeneca raised the price to roughly $4 per pill.

10. AstraZeneca's campaign worked. While sales of Prilosec fell in response to generic competition, sales of Nexium sky rocketed to reach $3.3 billion by 2003.

11. AstraZeneca's Nexium promotional and advertising campaign has resulted in billions of dollars of unnecessary drug expenditures at a time when rising drug prices have created a health care crisis in this country. AstraZeneca justified Nexium's superiority and effectiveness based on the previously noted clinical study sponsored by AstraZeneca that compared 40 mg. of Nexium to 20 mg. of Prilosec. From this study, which compared twice the dose of Nexium to the standard dose of Prilosec, AstraZeneca proclaimed Nexium's effectiveness. A dose of 40 mg. is not needed in most patients and a fair comparison of 20 mg. of Nexium to 20 mg. of Prilosec would not have proven Nexium to be superior. Treatment with Prilosec now costs about one eighth of the cost of Nexium and can be obtained over the counter. As a result of this misleading campaign, hundreds of thousands of patients have taken Nexium and continue to do so when they should not have, and billions in unnecessary prescription costs have been paid.

12. In 2003, the former administrator of the federal Centers for Medicare and Medicaid Services, Thomas A. Scully, stated to a convention of the American Medical Association: "You should be embarrassed if you prescribe Nexium because it increases costs with no medical benefits."[3] Mr. Scully noted "[t]he fact is Nexium is Prilosec ... [i]t is the same drug. It is a mirror compound." Mr. Scully further stated that "*Nexium is a game that is being played on the people who pay for drugs.*"

---

[3] NEW YORK TIMES, April 21, 2003.

4

*13.* In this action Plaintiffs seek restitution and equitable relief arising out of AstraZeneca's sale and promotion of Nexium pursuant to practices and acts that are unfair, deceptive and unlawful in violation of Mass. Gen. Laws ch. 93A *et seq.*

## II. PARTIES

14. Plaintiff Commonwealth Care Alliance ("CCA") is a prepaid care system contracting with Medicare and Massachusetts Medicaid to provide comprehensive care to vulnerable, high cost populations. It is located in Boston, Massachusetts. CCA is third-party payor that paid for Nexium on behalf of its beneficiaries during the Relevant Period, and was injured by the illegal conduct described in this Complaint. CCA has standing to bring this action on behalf of itself and all other third-party payors who paid for Nexium in or purchased in the Commonwealth of Massachusetts.

15. Plaintiff Health Care For All ("HCFA") is a consumer health advocacy organization that has led the fight in Massachusetts to expand access to affordable, quality health care since 1985. It is located in Boston, Massachusetts. HCFA's members purchase and have purchased Nexium during the Relevant Period, and were injured by the illegal conduct described in this Complaint. As an organizational plaintiff, HCFA has standing to bring this action on behalf of itself and all consumers in the Commonwealth of Massachusetts.

16. Plaintiff Glenn Crenshaw is a resident of the Commonwealth of Massachusetts residing in Everett, Massachusetts. During the Relevant Period, Glenn Crenshaw purchased Nexium and was injured by the illegal conduct described in this Complaint. Specifically, he took Nexium for approximately one year during which he

paid co-payments through his insurance plan. As an individual, Glenn Crenshaw pursues this class action on behalf of himself and all those similarly situated.

17. Plaintiff Paula Crenshaw is a resident of the Commonwealth of Massachusetts residing in Everett, Massachusetts. During the Relevant Period, Paula Crenshaw purchased Nexium and was injured by the illegal conduct described in this Complaint. Specifically, she took Nexium for at least one year to treat reflux disease. Paula Crenshaw paid co-payments through her insurance plan. As an individual, Paula Crenshaw pursues this class action on behalf of herself and all those similarly situated.

18. Defendant AstraZeneca Pharmaceuticals L.P. is a Delaware corporation, with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware. AstraZeneca Pharmaceuticals L.P. is owned and controlled by AstraZeneca PLC, a public limited liability company domiciled in the United Kingdom.

19. Defendant AstraZeneca US is a Delaware corporation with its principal place of business at 1800 Concord Pike, Wilmington, Delaware.

20. Defendant Zeneca, Inc. ("Zeneca") is a Delaware corporation with its principal place of business at Malvern, Pennsylvania. Zeneca is a wholly owned subsidiary of AstraZeneca, PLC, a limited liability company domiciled in the United Kingdom.

21. Defendant Zeneca Holdings, Inc. ("Zeneca Holdings") is a Delaware corporation and wholly owned subsidiary of AstraZeneca, PLC, a limited liability company domiciled in the United Kingdom, engaged in the marketing and production of defendants' products.

22. AstraZeneca Pharmaceuticals L.P., AstraZeneca, PLC, AstraZeneca U.S., Zeneca, Inc., and Zeneca Holdings, Inc. are collectively referred to as "AstraZeneca."

23. AstraZeneca maintains research and development and manufacturing facilities worldwide, including in the United States. AstraZeneca reported annual sales of $16.5 billion in 2001, with an operating profit of $4.2 billion.

## III.    JURISDICTION AND VENUE

24. Plaintiffs bring this class action under Mass. Gen. Laws ch. 93A, *et seq.* for false advertising and unfair and deceptive trade practices, for monetary, declaratory and injunctive relief as well as reasonable attorneys' fees and costs with respect to injuries sustained by Plaintiffs and members of the Class arising from violations by Defendants.

25. This Court has subject matter jurisdiction over all causes of action asserted herein pursuant to Mass. Gen. Laws ch. 212 § 4. This Court has personal jurisdiction over the parties because Plaintiffs and the members of the Class submit to the jurisdiction of this Court and Defendants systematically and continually conduct business in, or otherwise intentionally avails itself of, the Massachusetts marketplace through the production, promotion, sale, marketing and distribution of its products and services in Massachusetts. Mass. Gen. Laws ch. 223A § 3.

26. Venue is proper in this Court because Plaintiffs reside in Suffolk County and Defendants conduct business in Suffolk, including marketing, advertising and sales directed at Massachusetts residents, and maintain their agent for service of process in Suffolk County. Mass. Gen. Laws ch. 223 § 1.

27. Plaintiffs, through counsel, have sent by certified mail a demand for relief to AstraZeneca Pharmaceuticals LP, AstraZeneca LP, and Zeneca Holdings, Inc. pursuant to Mass. Gen. Laws ch. 93A reasonably identifying one or more of the claimants and reasonably describing the unfair and deceptive acts and practices committed by AstraZeneca alleged herein, and the injury suffered. AstraZeneca, through counsel,

7

responded without tender of settlement. More than 30 days has passed since the demand letter was sent.

## IV.    FACTUAL ALLEGATIONS

### A.    Prilosec – A Blockbuster Drug for AstraZeneca

28. Prilosec (also known as Losec) is a proton pump inhibitor and, according to AstraZeneca's publicly filed documents, by the year 2000 had "set a new global standard in short and long-term treatment of acid related diseases." According to AstraZeneca's publicly filed documents, Prilosec has benefited patients in 530 million patient treatments since 1980 and "is the world's largest selling pharmaceutical." Prilosec was AstraZeneca's most profitable drug with worldwide sales of over $6 billion by 2000.[4]

29. Patent protection for omeprazole, the active substance in Prilosec, expired in all major markets by the end of 2000, but patent term extensions extended protection until April 2001 in the United States.

30. With the looming loss of patent protection, AstraZeneca faced the erosion of its number one drug. To put this in perspective, sales of Prilosec of $5.9 billion in 2000 comprised 39% of AstraZeneca's revenue, with the next drug at 8%.

### B.    The Loss of Patent Protection Results in Lower Prices and Reduced Profits

31. For every year from 1995 through 2002, the pharmaceutical industry was the most profitable industry in the United States, although its profitability declined somewhat in 2002. In 2003, drug companies ranked as the third most profitable industry (14.3%), with mining, crude-oil production the most profitable industry (20.1%) and commercial banks the second most profitable (18.6%). Drug companies were more than three times

---

[4] 2001 Annual Report at p. 38.

as profitable as the median for all Fortune 500 companies in 2003 (14.3% compared to 4.6%).[5]

32. The most profitable drugs are brand name drugs. Brand name drugs typically sell at three times or more than that of a generic drug.

### C.    The AstraZeneca Solution – The New Purple Pill Nexium

33. Faced with the catastrophic loss of sales from its flagship drug, AstraZeneca carefully plotted a new strategy. The plotting was done by the Shark Fin Project, a group of marketers, lawyers and scientists charged with developing a strategy for averting the patent expiration disaster. The name of the group derives from the dismal shape the sales chart would trace if AstraZeneca did nothing: an inverted V. Eventually the centerpiece of that strategy was the marketing and promotion of the new drug Nexium. Nexium was viewed by several executives as the poorest solution because it was not any better for ordinary heartburn than Prilosec.

34. AstraZeneca's plan was to promote Nexium as an improvement to Prilosec and to have brand loyalty built before the expiration of Prilosec's patents. AstraZeneca knew that brand loyalty is critical – once a doctor locks onto a drug for a certain treatment – he/she is unlikely to change. The same is true for the consumer.

35. AstraZeneca sponsored several studies to justify use of Nexium. The study that it used to obtain FDA approval concluded that Nexium *at twice* the standard dose of Prilosec was *slightly* more effective:

> Investigators observed that the time intragastric pH was greater than four during a 24-hour period was longer with **Nexium 40 mg** once daily than standard healing doses for erosive esophagitis of four other branded proton pump inhibitors currently available by prescription in the United States. On day five, intragastic pH was maintained above 4.0 for a mean of 14.0 hours with **Nexium** 40 mg, 12.1 hours with Aciphex 20 mg, 11.8 hours with **Prilosec 20 mg**, 11.5 hours with Prevacid 30 mg, and 10.1 hours with Protonix 40 mg. **Nexium** also provided a significantly higher percentage of

---

[5] *Trends as Indicators in the Charges*, Health Care Marketplace 2004 Update, Kaiser Family Foundation.

patients with an intragastric pH > 4.0 for > 12 hours relative to the
other proton pump inhibitors (p<0.05).

36. AstraZeneca did not publish a clinical study of the effectiveness of 20 mg of

Nexium versus 20 mg of Prilosec. This study found that Nexium was not more effective

than Prilosec.

37. AstraZeneca did not publish the negative study or a negative study comparing

40 mg of Nexium and 20 mg of Prilosec.

### D.    A Massive Promotional Campaign and Predatory Price Is Used to Establish Nexium

38. After the sponsored study was concluded, AstraZeneca used the study to

promote Nexium as a superior product.

39. For example, in its 2000 Annual Report, AstraZeneca claimed that:

- *Nexium* is the first PPI to offer significant clinical improvements over *Losec* in terms of acid control and clinical efficacy, shown in clinical studies involving over 30,000 patients performed across 20 countries. It is expected to establish a new, improved treatment standard for the PPI class.

- *Nexium* offers more effective acid inhibition than other PPIs and in the treatment of reflux oesophagitis, provides healing and symptom relief in more patients and in a shorter period of time than *Losec*. It is an effective, long-term therapy for GERD patients and can be taken when needed (on demand) to prevent relapse. For the treatment of active duodenal ulcers, seven-day *Nexium* triple therapy (in combination with two antibiotics for the eradication of H.pylori) heals most patients without the need for follow-up antisecretory monotherapy.

40. AstraZeneca used these themes in a massive promotional campaign launched

to have Nexium replace Prilosec as its flagship drug. AstraZeneca sales representatives

spent 2000 and 2001 in a frenzied sales pitch as to the superior qualities of Nexium. In

the first ten months of 2001 alone, AstraZeneca spent $98 million on direct-to-consumer

promotions, again claiming Nexium was superior to Prilosec.

41. Nexium advertisements directed to physicians claimed that the new drug was

more powerful than Prilosec: "we've captured the essence of Prilosec and created a new

PPI ... introducing Nexium the powerful new PPI from the makers of Prilosec...."

42. Its 6000 person sales force flooded doctors' offices with free samples and

claims of Nexium's superiority. A July 6, 2002 *Wall Street Journal* article depicts one

type of pitch made to doctors:

> Peter Halper, an internist at a large group practice in Manhattan,
> has a computer given him by a drug-marketing firm on condition
> he chat with drug-company marketers via the Internet from time to
> time. Recently, he checked in with AstraZeneca. The face of a
> salesman popped onto his screen, asking him how he was and then
> launching into a pitch for Nexium.
>
> Dr. Halper asked the salesman why Nexium was better.
>
> "The proof's in the healing rates," said the live salesman, who
> cited data comparing 40 mg. of Nexium to 20 mg. of Prilosec.
> 'We're safer, with no drug-to-drug interactions. We're also the
> No. 1 proton-pump inhibitor among gastrointestinal specialists.'
> While he spook, several graphs flashed on the screen.
>
> 'So have I shown you how we differ from the other drugs?' the
> salesman asked. Dr. Halper said he had. 'Do you need any more
> samples delivered?' No, Dr. Halper said, he had plenty.
>
> Minutes later, two salesmen from AstraZeneca arrived to talk to
> Dr. Halper about Nexium. They made sure to restock his cabinet
> with free Nexium. Since many physicians view Prilosec and
> Nexium as virtually identical, they often prescribe whichever one
> is in their free-sample closet. Patients who begin with free samples
> often continue with paid prescriptions, so the freebies are effective
> marketing tools.

43. No mention in this sales pitch was made of the fact at equivalent doses

Nexium was not effective, nor was the claim of "superiority" accurate in that the clinical

study showed just a slight increase in efficacy for only one type of patient and that one of

the trials showed no increase in efficacy.

44. AstraZeneca also engaged in a massive advertising campaign directed at

consumers. The intent of these advertisements is to cause consumers to want to use

Nexium. Studies show that such advertisements are effective in causing patients to

pressure doctors into prescribing expensive and marginally helpful new drugs. Doctors

do not want to alienate patients and find it easier and faster to write the prescription than

to explain cheaper alternatives. This is why such direct-to-consumer advertising is

prohibited in every other developed country (except New Zealand).

45. The promotional campaign was massive in terms of spending and effort:

- To promote **Nexium,** AstraZeneca retained the professional and consumer advertising agencies that handle the **Prilosec** promotion. The professional ad agency of record for **Nexium** is Grey Healthcare Group Inc. (ghgroup.com). Klemtner Advertising Inc., a division of Nelson Communications' Healthcare Resources Group Inc., is the consumer advertising agency of record.

- AstraZeneca last year spent $ 97.9 million on the consumer campaign for **Nexium** through October, placing the product as the third most-promoted prescription drug to consumers during this period. This amount was 84.4% of AstraZeneca's total expenditure for direct-to-consumer advertising in the first 10 months of the year. The company's direct-to-consumer campaign expenditure for **Nexium** totaled more than the entire consumer advertising efforts in that period for Abbott Laboratories (abbott.com), Eli Lilly & Co. (lilly.com), and Novartis (novartis.com). Nexium was the fourth most-promoted drug in medical journals in 2001, according to Perq/HCI (www.perqhciresearch.com)

46. The effectiveness of such advertising was not lost on AstraZeneca. A Kaiser

Family Foundation study found that:

- Nearly a third (30%) of adults have talked to their doctor about a drug they saw advertised, and 44% of those who talked to their doctor received a prescription for the mediation they inquired about. This means that one in eight Americans (13%) has received a specific prescription in response to seeing a drug ad.

- After viewing specific prescription drug ads, about four in ten said they were very or somewhat likely to talk to their doctor about the drug they saw advertised (37%) and/or to talk to their doctor about the health condition mentioned in the ad (40%).

47. Millions of patients including those in Massachusetts were exposed to

advertisements for Nexium.

48. AstraZeneca also engaged in what would, if Prilosec was manufactured by

another company, be predatory pricing in violation of federal and state antitrust law. It

offered Nexium at prices below the price of its own Prilosec, hoping that if it established

Nexium as a replacement with doctors and consumers, it could later raise the price of

Nexium and reap substantial profit after Prilosec's patent had expired.

    E.    **Nexium Is Not More Effective**

    49. The truth is that there is no evidence that Nexium is superior, at standard

doses, to Prilosec and other PPIs:

> However, it appears that AstraZeneca, the manufacturer of
> Prilosec, has been remarkably successful in switching consumers
> to its newer and more expensive PPI: Nexium (esomeprazole),"the
> purple pill." Sales of esomeprazole (both brand name Prilosec and
> generic) declined from $4 billion (February 2002 to January 2003)
> to $2.9 billion (February 2003 to January 2004), while sales of
> Nexium increased from $2.3 billion to $3.6 billion for the same
> time frame. The number of omeprazole (brand name and generic)
> prescriptions declined from 21.5 million to 17.1 million for those
> time periods, while the number of Nexium prescriptions increased
> from 15.1 million to 21.3 million, according to NDCHealth.
>
> Drugs for Peptic Ulcers
>
> This is remarkable since there is no evidence that Nexium is any
> more effective than Prilosec. The two medications are close
> chemical relatives. Prilosec is made up of two molecules which are
> mirror images of each other, while Nexium is made of one of those
> same molecules. Clinical trials testing 20 mg or 40 mg of
> Nexium against 20 mg of Prilosec. "Some
> patients may need 20 mg while some need 40 mg," Dr.
> Abramowicz says. "When optimal doses are used, Prilosec and
> generic omeprazole appear to be as effective as Nexium or any
> other PPI." *(Source: Managed Healthcare Executive April 1,
> 2004)*
>
> 50. The situation was described by *Health Facts* as follows:
>
> It's tempting to dismiss Nexium as just another "me too" drug, one
> chemical notch away from the other PPIs, and one more example
> of a pharmaceutical company trying to make us think it has come
> up with something new. But actually Nexium signals a new
> pharmaceutical industry twist. Normally, a company makes a me-
> too drug to cut into a competitor's profits, but in this case, both

Prilosec and Nexium are made by the same company.
AstraZeneca's reason for competing with its own product is
obvious. ~~Prilosec (called Losec in Canada) will soon lose its patent,
and generic versions will become available at about two-thirds the
cost.~~

Gone is the pretense that carried the day for Prozac's competitors,
who claimed that their me-too antidepressants (Zoloft, Paxil, etc.)
had fewer side effects. There is no significant difference in side
effects between Prilosec and Nexium. Both drugs come in
delayed-release form, so AstraZeneca has not introduced a new
format. In fact, ~~Nexium offers no innovation; the drug owes its
existence entirely to AstraZeneca's need to retain the company's
considerable share of the $8.3 billion PPI Market.~~

51. The *Los Angeles Times* described the marketing of Nexium as follows:

As an example, Cohen **compares Nexium,** the new stomach-acid
controller, to **Prilosec,** which ~~is virtually identical and for which a
generic is available for a price about 10 times less.~~ But once a
patient tries **Nexium** and is doing well, he's not going to want to
switch, Cohen says. "Every dollar that goes into these 'me-too'
drugs that are virtually the same as existing drugs is a dollar that is
bled out of the health-care system. Drug companies are looking
for their profits and will squeeze it every way they can." *(Source:
Los Angeles Times February 15, 2004)*

52. CMS Administrator Tom Scully in 2003 told physicians at a convention of the

American Medical Association that they should not prescribe the heartburn treatment

**Nexium** because **Prilosec,** an older version of the medication that became available in

generic form in December 2002, costs less and provides the same level of treatment.

Mr. Scully told doctors, "[y]ou should be embarrassed if you prescribed **Nexium,**"

because it increases costs with no medical benefits. "The fact is, Nexium is Prilosec,"

Mr. Scully said. "It is the same drug. It is a mirror compound." Mr. Scully said he had

no problem paying thousands of dollars a year for an innovative drug that saves lives, like

Gleevec, for certain types of leukemia and gastrointestinal tumors. But he said, *"Nexium

is a game that is being played on the people who pay for the drugs making it one of the

most successful launches ever of a new medicine."*[6]

---

[6] 2003 Annual Report, Chief Executive's Overview.

**F.    AstraZeneca's Marketing Campaign Has Been Successful:  Nexium's Price Increased and Sells Billions Per Year**

53. Sales of Prilosec have plummeted in response to generic competition.  In its 2003 Annual Report, AstraZeneca's Chief Executive boasted of the transformation from Prilosec to Nexium, trumpeting the $3.3 billion in Nexium sales achieved in less than three years "after its introduction."

54. Having established Nexium's position and capitalizing on brand loyalty, AstraZeneca then raised the price of Nexium.  It now sells for $4.09 per pill versus $0.46 per pill for Prilosec.

55. A recap of Prilosec and Nexium sales reveals the success of Nexium in replacing Prilosec (data for 2004 only includes first six months of that year):

### PRILOSEC VS NEXIUM SALES RECORDS
### 1998 THROUGH 1st Half 2004

| YEAR | WORLDWIDE PRILOSEC/LOSEC | U.S. PRILOSEC | WORLDWIDE NEXIUM | U.S NEXIUM |
|---|---|---|---|---|
| 1998 | 4,845,000,000[7] | --- | --- | --- |
| 1999 | 5,909,000,000[8] | --- | --- | --- |
| 2000 | 6,260,000,000[9] | | 17,000,000[10] | Launched |
| 2001 | 5,684,000,000[11] | 3,694,000,000[12] | 580,000,000[13] | 456,000,000[14] |
| 2002 | 4,623,000,000[15] | 2,847,000,000[16] | 1,978,000,000[17] | 1,525,000,000[18] |

---

[7] Source:  2000 Annual Report p. 41.

[8] *Ibid.*

[9] Source:  2000 Annual Report p. 38.

[10] Source:  2001 Annual Report p. 7.

[11] Source:  2001 Annual Report p. 7.

[12] Source:  2001 Profit & Loss Statement p. 7.

[13] Source:  2001 Annual Report p. 7.

[14] Source:  2001 Annual Report pp. 34, 36.

[15] Source:  2002 Annual Report p. 9.

[16] Source:  2002 Profit & Loss Statement p. 8.

[17] Source:  2002 Annual Report p. 9.

[18] Source:  2002 Profit & Loss Statement p. 8.

| YEAR | WORLDWIDE PRILOSEC/LOSEC | U.S. PRILOSEC | WORLDWIDE NEXIUM | U.S NEXIUM |
|------|------|------|------|------|
| 2003 | 2,565,000,000[19] | 867,000,000[20] | 3,300,000,000[21] | 2,477,000,000[22] |
| 2004 | 1,071,000,000[23] | 208,000,000[24] | 1,826,000,000[25] | 1,280,000,000[26] |

## V.   CLASS ALLEGATIONS

56. Plaintiffs bring this action on behalf of themselves and a class defined as follows: All persons or entities in Massachusetts who purchased Nexium in the four (4) years preceding the filing of this Complaint up to and including the present.

57. The Class consists of tens or hundreds of thousands of individuals and entities throughout Massachusetts, making individual joinder impractical. The disposition of the claims of the Class members in a single class action will provide substantial benefits to all parties and to the Court.

58. The claims of the representative Plaintiffs are typical of the claims of the Class because they, like all Class members, have purchased Nexium and have been harmed by Defendants' misconduct because they would not have purchased Nexium had they known the truth.

59. The factual and legal bases of Defendants' misconduct are common to all Class members and represent a common thread of deception and other misconduct resulting in injury to Plaintiffs and all members of the Class.

60. There are many questions of law and fact common to Plaintiffs and the Class, and those questions substantially predominate over any questions that may affect

---

[19] Source:  2003 Annual Report pp. 5, 13.

[20] Source:  Consolidated Profit & Loss p. 18.

[21] Source:  2003 Annual Report pp. 1, 13.

[22] Source:  2003 Annual Report p. 13.

[23] Source:  2004 Second Quarter Product Sales p. 17.

[24] *Ibid.*

[25] *Ibid.*

[26] *Ibid.*

individual Class members.  Common questions include, but are not limited to, the following:

    a.    Whether Defendants' active concealment of and/or failure to disclose the true nature of Nexium was likely to mislead or deceive within the meaning of M.G.L. c.93A *et seq.*;

    b.    Whether Defendants' active concealment of and/or failure to disclose the true nature of Nexium is unfair within the meaning of M.G.L. c.93A *et seq.*, in that the harm to consumers and the public of such conduct outweighs its benefits;

    c.    Whether Defendants' active concealment of and/or failure to disclose the true nature of Nexium is unlawful within the meaning of M.G.L. c.93A *et seq.*, in that it constitutes a violation of M.G.L. c.93A *et seq.*;

    d.    Whether Defendants engaged in false advertising within the meaning of M.G.L. c.93A *et seq.* when it represented, through its advertisements, promotions and other representations, that Nexium had characteristics that it does not actually have or omitted to disclose material facts regarding Nexium's actual characteristics;

    e.    Whether Defendants should be declared financially responsible for notifying all Class members of the true nature of Nexium; and

    f.    Whether Defendants should be ordered to disgorge, for the benefit of the Class, all or part of its ill-gotten profits received from the sale of Nexium, and/or to make restitution to Plaintiffs and the members of the Class.

61. Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving pharmaceutical sales.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interests adverse to those of the Class.

62. Plaintiffs and the members of the Class suffered, and will continue to suffer, harm as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the

controversy. Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. Because of the relatively small size of each individual Class member's claims, few Class members likely could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class members will continue to suffer harm and Defendants' misconduct will proceed without remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. Additionally, Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Class and require Court imposition of relief as to the Class as a whole.

## FIRST CAUSE OF ACTION

### Unfair and Deceptive Practices
### (M.G.L. c.93A, *et seq.*)

63. The preceding paragraphs of this Complaint are realleged and incorporated by reference as if fully set forth herein. Plaintiffs assert this claim on behalf of themselves and members of the Class.

64. Defendants' actions, as complained of herein, constitute unfair, deceptive, and unlawful practices committed in violation of M.G.L. c.93A *et seq.*

65. Defendants actions constitute unfair and deceptive acts, undertaken willfully and knowingly. They include:

66. Defendants' promotion of Nexium as "more powerful," "offering significant improvements over Prilosec," and as being "more effective" were false and/or misleading in that except for rare patients none of the above are true; in comparable doses Nexium is not more effective, is far more expensive than comparable drugs and in fact Nexium was promoted solely for financial reasons and not due to any material increase in medical efficacy.

67. Defendants' conduct was unfair in that by promoting Nexium directly to consumers, without disclosure of the above, who have inferior knowledge and sophistication, Defendants created demand for Nexium that would not have existed if Defendants had disclosed the true cost and benefits of Nexium versus Prilosec and/or other PPIs; and

68. Defendants omitted material information known to them that would have disclosed materially adverse facts to doctors and consumers in order to induce doctors to prescribe Nexium and consumers to purchase Nexium.

69. As a result of Defendant's conduct in violation of the Mass. Gen. L. Ch. 93A, *et seq.*, plaintiffs have been harmed.

70. Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of such unfair practices, as provided in M.G.L. c.93A, and for such other relief as set forth below.

## SECOND CAUSE OF ACTION

### Unfair and Deceptive Practices - False Advertising
### (M.G.L. c.93A, *et seq.* and 940 CMR § 3.02, as promulgated thereunder )

71. The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Class.

72. Defendants' actions, as complained of herein, constitute false advertising in violation of 940 CMR § 3.02, as promulgated pursuant to M.G.L. c.93A § 2(a) for purposes of determining whether conduct, terminology or representations involve unfair methods of competition or unfair or deceptive acts or practices.

73. 940 CMR § 3.02 provides that "No statement or illustration shall be used in any advertising which creates a false impression of the...quality, make...or origin of the product offered, or which may otherwise misrepresent the product in such a manner that

later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised product to another."

74. As a result of the violations of 940 CMR § 3.02 described above, Defendants have been, and will be, unjustly enriched at the expense of Plaintiffs and the general public. Specifically, Defendants have been unjustly enriched by their receipt of monies received from customers who purchased Nexium, which is advertised and/or otherwise marketed in this State and was promoted and sold through advertising and marketing materials that materially misrepresent the quality and functions of the product.

75. Pursuant 940 CMR § 3.02, as promulgated under M.G.L. c.93A, *et. seq.*, as Plaintiffs are suing on behalf of themselves and members of the Class, Plaintiffs are entitled to the remedies set forth below.

## THIRD CAUSE OF ACTION

### Unfair and Deceptive Practices – Deceptive Pricing
### (M.G.L. c.93A, *et seq.* 940 CMR § 3.04, as promulgated thereunder)

76. The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiffs on behalf of themselves and members of the Class.

77. Defendants' actions, as complained of herein, constitute deceptive pricing in violation of 940 CMR § 3.04, as promulgated pursuant to M.G.L. c.93A § 2(a) for purposes of determining whether conduct, terminology or representations involve unfair methods of competition or unfair or deceptive acts or practices.

78. 940 CMR § 3.04 provides that "No claim or representation shall be made by any means which has the capacity or tendency or effect of deceiving buyers or prospective buyers as to the value or the past, present, common or usual price of a product, or as to any reduction in price of a product, or any savings relating to a product."

79. As a result of the violations of 940 CMR § 3.04 described above, Defendants have been, and will be, unjustly enriched at the expense of Plaintiffs and the general

public. Specifically, Defendants have been unjustly enriched by their receipt of monies received from customers who purchased Nexium, which is advertised and/or otherwise marketed in this State and was promoted and sold through advertising and marketing materials that materially misrepresent the quality and functions of the product.

80. Pursuant 940 CMR § 3.04, as promulgated under M.G.L. c.93A, *et. seq.*, as plaintiffs are suing on behalf of themselves and members of the Class, Plaintiffs are entitled to the remedies set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Class request that the Court enter an order or judgment against Defendants as follows:

A. Certification of the Class and appointment of Plaintiffs as Class Representatives and Plaintiffs' counsel of record as Class Counsel.

B. Damages for the harm caused by its unlawful conduct, calculated as the actual damages determined at trial or $25 per sale of Nexium in Massachusetts, whichever is greater.

C. Treble damages and all other penalties pursuant to Mass. Gen. L. Ch. 93A, *et seq.*

D. Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendants as a result of the unfair, unlawful and/or deceptive conduct alleged in this Complaint;

E. Prejudgment and post-judgment interest on such monetary relief, awarded in accordance with Massachusetts law;

F. Appropriate injunctive relief;

G. An order awarding Plaintiffs the costs of bringing this suit, including attorneys' fees; and

H.  All other relief to which Plaintiffs and members of the Class may be
entitled at law or in equity.

HAGENS BERMAN LLP

By _____ *signature* _____

Thomas M. Sobol, BBO no. 471770
David S. Nalven, BBO no. 547220
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone:  (617) 482-3700

Steve W. Berman
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  (206) 623-7292

Attorneys for Plaintiffs

DATED:  January 25, 2005

22

| PLAINTIFF(S) Commonwealth Care Alliance, Health Care for All, Glenn Crenshaw, Paula Crenshaw | DEFENDANT(S) Astra Zeneca Pharmaceuticals, L; Astra Zeneca PLC, Astra Zeneca US, Zeneca Inc., and Zeneca Holdings, Inc. |

| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Thomas M. Sobol (BBO 471770) David S. Nalven (BBO 547220) Hagens Berman LLP, One Main Street, | ATTORNEY (if known) Harvey J. Wolkoff Ropes & Gray, One International Place, Boston, MA 02110 |
Board of Bar Overseers Number:

4th Floor, Cambridge, MA 02142

**Origin Code**

**Original Complaint**

### TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

CODE NO.      TYPE OF ACTION (specify)    TRACK      IS THIS A JURY CASE?

___BH2___    __c. 93A Class Action__( **B** )    ( X )Yes    ( ) No

**The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.**

*and third-party payers*

This is a class action under G.L. c. 93A for false advertising and unfair and deceptive trade practices. Plaintiffs are consumers/of the prescription drug Nexium. Defendants are the pharmaceutical manufacturer and related entities responsible for the marketing and sale of the drug. The complaint alleges that the defendants unlawfully sought to preserve their market share and profits as the patent on their blockbuster drug Prilosec was set to expire by manufacturing and marketing a nearly identical replacement drug, Nexium, and by initiating a massive and misleading advertising and promotional campaign to deceive consumers into purchasing Nexium. Consumers and third-party payors of prescription drugs overpaid by many millions of dollars as a result of defendants' unfair and deceptive conduct.

*A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT    None

**"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."**

Signature of Attorney of Record _____    DATE: 1/25/05


CT System



**Service of Process Transmittal Form**

Boston, Massachusetts

02/02/2005

Via Federal Express (Overnight)

TO:  Laura Davies Legal Department (FOP3)
AstraZeneca Pharmaceuticals LP
1800 Concord Pike
Wilmington, DE 19850

RE:    **PROCESS SERVED IN MASSACHUSETTS**

FOR    ZENECA RESINS HOLDINGS INC. Domestic State: De

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

| | |
|---|---|
| 1. TITLE OF ACTION: | Commonwealth Care Alliance, et al., Pltf. vs AstraZeneca Pharmaceuticals L.P., et al., including Zeneca Resins Holdings Inc. Deft. |
| 2. DOCUMENT(S) SERVED: | Summons, Complaint |
| 3. COURT: | Commonwealth of Massachusetts, Suffolk Superior Court Case Number 05-0269 |
| 4. NATURE OF ACTION: | Deception and other misconduct resulting in personal injury/unlawful and wrongful conduct/Unfair and deceptive business acts and/or practice |
| 5. ON WHOM PROCESS WAS SERVED: | CT Corporation System, Boston, Massachusetts |
| 6. DATE AND HOUR OF SERVICE: | By Process server on 02/02/2005 at 11:30 |
| 7. APPEARANCE OR ANSWER DUE: | Within 20 Days |
| 8. ATTORNEY(S): | Thomas M. Sobol  617-782-3700 One Main Street 4th Floor Cambridge, MA 02142 |
| 9. REMARKS: | According to the records of our office our services have been discontinued in this state.// Even though complaint names Zeneca Holdings Inc.,  Summons names Zeneca Resins Holdings Inc. as the entity being served.  (This was served to CT w/Zeneca Resins Holdings Inc written in.)// Left voicemail for Laura Davies regarding this case.  Sending to her attention in the same fedex envelope as process served on : Astra Zeneca LP.  /CB |

| | |
|---|---|
| SIGNED | CT Corporation System |
| PER | Allison Liberto /YC |
| ADDRESS | 101 Federal Street Boston, MA 02110 SOP WS 0006965501 |

Information contained on this transmittal form is recorded for C T Corporation System's record keeping purposes only and to permit quick reference for the recipient. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information that can be obtained from the documents themselves. The recipient is responsible for interpreting the documents and for taking the appropriate action.

# Commonwealth of Massachusetts

SUFFOLK, ss.



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 05-0269

Commonwealth Care Alliance, Health
<u>Care for All, Glen & Paula Crenshaw</u> , Plaintiff(s)

v.

AstraZeneca Pharmaceuticals
L.P., AstraZeneca PLC, AstraZeneca US,
<u>Zeneca, Inc., & Zeneca Holdings, Inc</u>.·Defendant(s)

## SUMMONS

To the above-named Defendant: Zeneca Holdings, Inc, *Zeneca Resins Holdings Inc*

You are hereby summoned and required to serve upon_____Hagens Berman LLP_____

plaintiff's attorney, whose address is <u>One Main Street, Fourth Floor</u> , an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, **Barbara J. Rouse** ████████o, Esquire, at Boston, the___31st___ day of ___January___, in the year of our Lord two thousand ___05___

*Michael Joseph Donovan*

Clerk/Magistrate

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT    (2) MOTOR VEHICLE TORT    (3) CONTRACT    (4) EQUITABLE RELIEF    (5) OTHER

FORM CIV.P. 1 3rd Rev.

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.